In this case and the next one, we have more and more of a lawyer arguing his side, and I don't... So I'd like to know, in this case, and I'm going to ask the same question in the next two cases, how are you dividing the time? And then, sir, I would prefer, if you could, to put the time on the clock for each lawyer, rather than for us to keep track of it. So how are you trying to do that? Mr. Levine, I divide your time equally, Your Honor, and I do hope to reserve two minutes for rebuttal. Okay, so we're going to put ten minutes on the clock for you, and you can... I'm not going to police him if you go into his time. I will show you when your time is up. Oh, good. Thank you. Madam Chief of the Court, if I may, I would like to note the presence in the courtroom today of the chairman, members of the Tribal Council, and other members of the Havasupai Tribe of Jerusalem. The Canaanite uranium mine is situated in the midst of what is undoubtedly the most sacred site in the cultural landscape of the Havasupai people, powered by the towering topographical landmark known as Red Butte, a flat square in the middle of a small meadow just located to the north of the Butte, known in the Havasupai language as Mothta, to Jupiter. The question presented in this case, if you'll, of the Havasupai Tribe, is whether the United States Forest Service violated the Section 106 of the National Historic Preservation Act in making the determination that EFR, or its predecessor, I'll refer to all of them as EFR, could recommence development of the canyon mine after a 20-year hiatus in activity without conducting any bona fide consultation under Section 106 of the UNHPA to develop a memorandum of agreement on measures to avoid, minimize, or mitigate what would certainly be the adverse impacts, the serious adverse impacts of the canyon mine on the Red Butte traditional coastal property, including the meadow north of Jupiter. When EFR notified the Forest Service in August of 2011 that it intended to recommence mining operations of the canyon mine, the Forest Service had the authority at that time to make any modifications that were needed in the plan of operations that had been approved in 1986 in order to address previously unaddressed impacts of the mine on historic properties. It also... Now, is the government contesting that, i.e., whether it had authority to make changes or what have you, the fact that the plan of operation had already been approved under the standards available at that time, Judge Rizzo? The government... Clearly, the plan of operations had been approved in 1986. The government has not contested the fact that the Forest Service had the authority to make changes. In fact, that's set forth in the Forest Service's own regulations at 36 CFR 228.4E, and the existence of that power was expressed and noted in the record of decision approving the canyon mine kind of operations in 1986. On page 9, the reference appears in a paragraph dealing with a ground water monitoring component, but it clearly references the fact that that power does exist in the Forest Service, if needed, to address previously unaddressed impacts of the mine. Those facts alone... And they did request CFDX earlier, even though it was just strongly projected at the time? No. The Forest Service admitted in the Canyon Mine Review that was issued in 2012 that the adverse impacts under NHPA to the Canyon Mine DCP had never been examined previously. That is the record of the quote from the Canyon Mine Review. It appears in the excerpts of Frederick. Sorry. Let me ask you a point, Mike. You know, we had a successful plan of operation. We went through the entire process of 1988, and we didn't even know how many years we were given at that time. So, based on what you're arguing, that there should be an overall rule of law, this is what happened back in 1988, and the plan of operation is to expand the power of the mine and make sure that it's in a good position, that there should be a whole reconsideration of the position. Precisely, Your Honor, the fact that in 2002, the Forest Service acknowledged that repute in the surrounding area, including the site of the Canyon Mine itself, constituted the traditional cultural property eligible for listing on the National Register and, therefore, detected by the National Historic Preservation Act, that did not happen. That was not approved in 1986. I have a specification on having it now in the historic site. I understand that. But, subsequently, what was different then than what had existed in 1988 because of the time that this review took place? What was different in 2011 is that, given the fact that the repute had been designated a TCP... Let's talk about the designation itself. Did you see triggers for all of this? Yes, Your Honor, because that then triggers the obligation of the Forest Service to conduct consultation with the tribes under Section 106 of the NHPA, and that consultation... After all previous Section 106 consultations and divisions on all undertakings? No, Your Honor. The Section 106 consultation that occurred in the 1980s was an archaeological survey of the mine site, which uncovered three inconsequential archaeological sites in all six years. What's the specific, I guess, undertaking that you argued triggered Section 106? In this case, the determination about existing rights, the mineral report or the review of the existing plan of operations and analysis offered in the mine review? Well, first of all, a matter of terminology, the undertaking in our view is the recommencement of mining operations in Canyon Mine. Undertaking, as defined in the NHPA, is an action that requires federal license, permit, or approval. We contend, in this instance, it was very clear, as understood by all parties, that until PDR determination, the Valid Existing Rights determination, had been accomplished, EFR could not proceed with restarting operations in the mine. So we believe that that was a federal approval that made this recommencement of operations in Canyon Mine In this case, with regard to both your argument and the other issues about the mine, the claims of the claim itself, it's the same, I think, essentially the same, as the questions that underlined the part of the case. I'm sorry, you're on mute. The undertaking question and the question of whether there was a final action or a major final action, or whatever, are the same complex questions. You know, I think they are very comparable, but it's interesting that this report treats them very differently. In looking at whether the EFR determination was a major federal, lateral, or final agency action, he said, well, I don't think it's legally required, but it clearly has practical consequences, and when all parties understood that EFR could not continue until the EFR determination was done, and then when he looked at the question of whether there was an undertaking, he said, well, that requires a federal license, permit, or approval. It's not legally required, therefore, it's not an undertaking. And he never gave any consideration to the practical, the clear, practical effect that EFR could not start until the EFR determination had been completed and established that these were complex questions. Yes. No, you're right. The plan of operations was approved, strictly deals with the mining operation there in the meadow itself. It has nothing to do with the impacts of the mining on the surrounding area. It certainly has absolutely nothing to do with the impacts on the Tennessee Prosperous Noble Leaves. The record of decision, it depends, I assume, does reserve to Forest Service the ability to make changes in the plan of operations if unanticipated effects arise, and that is why we should intend that in addition to the fact that the EFR determination. I'm sorry. There was only one record of decision in 1986. No, they made, no, that was part of the record of decision. To deal with this position. But they said, when they considered the recommencement of operations, they said we are not making any changes in the plan of operations. They made that very clear to all the tribes, in fact. And the point is that at that point, the Forest Service, even if you don't agree that this was a new undertaking under the statute, the Forest Service had a clear continuing obligation under NHPA at every juncture at which it has the authority to change the project or come to deal with adverse impacts to newly recognized historic properties. Had it had that power, it was obliged at that point. We would have no claim here on it. It's not protected by the NHPA. Exactly, and that occurred in 2008. Your Honor, it's a joke. It's a total shame. They didn't comply with a single provision of the section of the regulations that they claimed was applicable here. They gave notice within 48 hours of deciding to disapply. That was 10 months after they learned that EFR wanted to commence operations. Either that it was a new undertaking or that the continuing obligation that this Court recognized and approved in Apache Survival Coalition versus the United States in 1994, the continuing obligation of the agency to comply with NHPA whenever it has the opportunity to make changes to deal with impacts that have not previously been addressed. That continuing obligation plainly was triggered here, and the District Court did not address that at all. I want to understand why you think people can point to this as a new undertaking. Your Honor, the definition of undertaking is what we rely upon, an action that requires a federal license for federal approval. We believe, given, and the record is very clear, everybody understood that until the Eurotermination was done, EFR could not continue. The Forest Service said that over and over. No, I mean, if one assumes that, what it was investigating was whether an earlier set of events were sufficient to constitute a permanent license or approval, or whether they needed a new one. And so what they ultimately decided was, we don't need a permanent license or approval because there already was one. No, the Forest Service repeatedly said, and said it in the Mineral Examination Report itself, that we will not allow mineral activities to occur in a withdrawn area unless valid existing rights are established. Are established? They were not established prior to the filling of the Mineral Report, Your Honor. They were established. The question is whether they were recognized as having been established. Well, there's this metaphysical concept in the mining law that a miner has valid rights unless they're disproved. The Forest Service took a very different view of the situation where mining is going to occur in a withdrawn area. And it said repeatedly in there, and there was a Forest Service policy that says this in black and white, that in a withdrawn area, mineral activities, not plans of operation, mineral activities may not occur unless valid existing rights are established. I don't know if BLM says what we might have said there, but they're wrong. Well, BLM has different policies, but the Forest Service does have the authority, and this Court has upheld it on several occasions, the Forest Service does have the right, the power, to regulate mining activities to the extent that they have impacts on service resources. And you upheld that in Carrick Tribe and River Tribe, and clearly that was the situation here. The Forest Service had the obligation to take steps to deal with the impacts of this mining law and the regulatory disputes. My time has long gone. I would like to have a discussion. Thank you. Thank you. Okay. Thank you, sir. So you're going to have two minutes to rebuttal. You'll have your ten minutes, and that's all the time there is. Thank you. Thank you. May it please the Court, Neil Levine on behalf of the conservation groups in the consolidated case. I, too, would like to reserve two minutes of my time if I can. I'll do my best to reserve as you're understood. The plaintiffs in this case challenged the Validation System Rights determination that's been talked about. That's the agency action that authorized mining on the public lands that had been withdrawn from the mining law in 2012. And I'd like to hit on two issues today. The first one being that we satisfy the zone of interest test to challenge the substance of the validity determination. And the second being that because the validity determination was required to authorize mining on withdrawn lands, this was a major federal action. It was an approval of the activities that required NEPA compliance. Mr. Nagler, is that not serious? This seems to suggest to me that they do not have to do any of this, that they absolutely have the right to continue mining. Yes, Your Honor. The key, there's two key points. One is, at the time of the case you're referencing, there was no withdrawal. The lands were not withdrawn at that time, and so there was no need for a validity determination at that time. The second is that we have a different claim. There was no need for a validity determination, but there was a need for a valid claim before they could actually mine. Correct. And in that case, the issue was different than what we have in our case. That case involved a supplemental NEPA claim. And we have a new action requiring a new major, which is a new major federal action. What action? The new action here is the validity determination in 2012. There's no doubt the difference is that whether you have a mining claim answers the question of whether you can mine. Whether you have a plan of operations determines how you can mine. There was a validity determination back in 1989. There was not. I'm sorry, Your Honor. There was no validity determination in 1989. That's in the record. There's nothing. In fact, that is why the Forest Service undertook the validity determination in 2012, because they knew they had no evidence to show that there were valid existing rights on those claims and their statutes, that there are existing rights and statutory authorization for that. Why do they have to consider this now? I don't understand. It's not a question about whether there are valid existing rights. Well, because the world changed in 2012. When the lands that were subjects of the mining law were withdrawn by the Secretary. And so that meant two things. One is that no new claims. Existing rights. I'm sorry? Subjects of valid existing rights. Correct, but. In the original withdrawal, you mentioned this mine is one in which there were valid existing rights. No, Your Honor. A careful read, and I don't even mean that careful, a read of the EIPA document and the rod that was associated with withdrawal anticipated that there may be valid existing rights there. And so for the purposes of analyzing the impacts of the withdrawal, they assumed. But if you look at the documents that we cited, referencing the index B of the EIS, they made clear that even though there was an assumption. All right. Let's get to the document. Okay. So you're ultimately talking about bonds, that these rights are shown in the EIPA report, right? Yes, Your Honor. Those are two things. So if you go to the bottom, and if this is even if it was necessary, once the decision was made, it wasn't discretionary. In other words, there was nothing the government had when it was investigating whether something that had happened 20 years ago was binding on it, and ultimately decided that it was. So what was the point of the EIPA report? Well, first off, the independence binding case, which is cited in the record in our briefs, says just the opposite, that the validity determination by the government is a judgment with ample discretion. And so the idea that the validity determination is not a discretionary action is not. It wasn't really a validity determination. My understanding of what it was was a determination about whether 25 years ago, it was a valid claim that had to go, which we should stand by and deny it. No, Your Honor. The test for validity is determined at the time of the withdrawal. This is, again, also in the record position for the withdrawal. Existing claims. So you can. Existing claims. No, Your Honor. The test. That is what the statute says now. The test asks if you have valid existing claims at the time of the withdrawal. Not at the time when you have a plan of operation. Well, as a way the law is, however, notwithstanding that term existing, the question is asked by the government, do you have valid existing rights at the time of the withdrawal? And so in this case, they were looking, if you look at the valid existing rights determination here, that document says that they had valid existing rights at the time of the January 2012 withdrawal. But what direct environmental impact flows from finding a mining claim is valid? All the impacts are flowing, but more. But how? What direct environmental impact flows from determining that a mining claim is valid? I mean, that's what they were doing here. Yes, Your Honor. So looking at the procedures and everything, how does, what is the, I'm trying to figure out the environmental impact from that. That would require what you're asking for. If the mining claim lacks validity, mining cannot go forward under the withdrawal because, as has been noted, it is subject to valid existing rights. As long as you have valid existing rights, you can go forward. But the converse is true too. If you lack valid existing rights and the Forest Service cannot make that determination based upon the record or the profitability determination, then the mining cannot go forward on these withdrawal claims. That's the, I mean that's the entire purpose of the withdrawal. It says no new claims, existing claims can't go forward, provided the Forest Service or the BLM makes the determination that the claims are valid at the time of the withdrawal, not back in the 1980s and putting aside the fact they never made that determination there. But the key point is that absence of the validity determination, mining cannot go forward. And the Clouser v. SBK says this, the Jelko v. Babbitt case says this, that when you have a withdrawn area, you need at that time to show valid existing rights. And the determination has to be made by the federal government. It's not something that is just presumed or can be unilaterally decided by the company. It's the agencies that have to make that determination. And when, when it was asked at that time, if there's that choice, do you defy that if the Forest Service is charged by law with making that determination? The record shows that in terms of projects that occur on Forest Service land, the Forest Service has been delegated that authority to make valid existing rights determinations. When it's on BLM lands, then the BLM has that authority to do so. You said something earlier about the independence of IPs as being determined here. What's determined about it? It demonstrates that the validity determination is a discretionary decision by the agency. How confident is this discretionary decision? I don't understand. Because the analysis that goes in, in terms of the cost benefits, include what are appropriate environmental things, but what are the appropriate environmental compliance costs, what are reclamation costs. These are all costs that get factored into the profitability determination. I guess I want to ask, again, my question because I don't understand it. I want to make sure I understand. It says whether a mining claim is valid, I think, requires establishing that a valuable deposit of uranium exists and can be profitably extracted. That doesn't seem to be an inquiry that implicates environmental interests. Again, how does the direct environmental impact flow from this mining claim and whether it's valid? Well, I think if you look at, again, the independence mining case, the BLM handbook on validity determination, all these acknowledge that environmental costs are factored into the profitability determination so that if the Forest Service, for example, decided that California condors have now been introduced and they are threatened by an open wastewater pit, they can impose mitigation measures to protect the condor from that activity. And those costs of doing so are factored back into the profitability determination. And some, of course, have said this. What is the best authority, I guess, that supports the challenging mining rights determination based on non-economic interests? Well, there's a District of Nevada case that we cite, the Barrick Goldstone case, I believe it's called. And that was a case where the agency was considering whether or not to impose measures to protect fish under the Endangered Species Act. And the court acknowledged that that is an exercise of agency discretion that factors back into the analysis of validity determination. So what if the mine continued to have been operating from 1988 to the present date? You're telling me that the Forest Service has the power to say, you can no longer operate the mine because we have now made the determination that you can no longer operate the mine. Is that your position? Well, of course, that's kind of what happened here. The Forest Service said to the agency, you cannot resume mining. Because in this case, they had stopped mining for years and years. But the reality here was the Forest Service did say, no, you cannot mine. I have to sign it until we finish the validity determination. And once that happened, they were allowed to go forward. And the scenario, your Honor points out, the analysis would have to occur and the Forest Service has a discretion at that point to say, you know what? You have to stop mining under your forest plan, under the plan of operations until we complete this whole triggered mine withdrawal of the land that's mined. Correct. And this is not, you know, this is an unusual situation. Because this, first off, this is a land withdrawal of a million acres. And this is the only mine that's subject, that's sort of in this situation. There's no other mines with a pre-approved plan of operation. I see that my time is up. Okay. Good morning, Your Honors. May it please the Court, my name is Tecla Hanson-Young, and I represent the Forest Service. The Forest Service here did everything it could within its limited authority to make sure that when Energy Fuels notified it that it planned to resume operations under the 1988 plan, that the mining operations were consistent with current environmental laws, that the environmental impact statement that had been done on the 1988 plan of operations was still valid, and that there was no need to amend the plan of operations under its regulations. The Forest Service concluded that in the mine review, that there was no unforeseen significant disturbance of land that would warrant changing the plan of operations. And neither of the plaintiffs has challenged the sufficiency of the mine review in this case. I'm sorry, there's an obligation that you can only respond if you've been in a candidate event. No, it was not. The plaintiffs have pointed to no statute, no regulation, and not even the withdrawal language itself that states that for plans that were previously approved before withdrawal, the Forest Service had to do either a mineral report, a mineral exam which verified valid existing rights in the Forest Service's belief, or a mine review, or for that matter, a new NHPA consultation. What the Forest Service did was take a thorough look at its obligations. But if you were to name the NHPA in general, does it provide for the need for some continuing obligation? In certain circumstances, yes, but not here, because here in the final agency action, that authorized mining was the 1988 plan of operations, and that has been clearly established by this court in the C.P. v. Salazar case involving the Arizona 1 mine, which had a previously approved plan of operations in 1988. The mining company there wanted to resume operations after it was in standby status for about 20 years. And these same plaintiffs, along with others, challenged the PLM's decision in that case, which actually was quite similar to what the Forest Service here did. It looked at what it needed to do, if anything, to make sure the plan of operations was still valid. I know you have some final agency actions here. There's the existing rights determination, which perhaps you argue is not really a final agency action. If this is what you're treating it as, perhaps or perhaps not, then you have the EIS determination that could be a final agency action. Neither of those are final agency actions. And let me just briefly explain what a mineral report does. We have a lot of citations and explanations that are brief, but just briefly here, the Forest Service does not have authority to implement or administer the mining laws. That is within the jurisdiction of the Department of Interior and the Bureau of Land Management. For mineral reports or mineral exams only, the Forest Service can do those with the agreement of the PLM. But the mineral report is only used as evidence in claim contests or contestability of mining claims. So if somebody feels like the mining claim is not valid, the Forest Service did not order, I mean there was no order per se. The Forest Service decided to do a mineral exam here to assure itself that there were valid existing rights. And here, the mineral report, it seems, satisfies in a practical sense because it immediately affected the parties by allowing the energy fuels to proceed with confidence in the validity of its claims. I have two points in response, Your Honor. First of all, that's not strictly true. The mineral report was finished several months before the Forest Service completed its mine review in 2012, and after the mine review concluded energy fuels and oil. I'm sorry. Well, the second point is that... It's the mine review. Then there's research kind of going back and forth about what it is that either they're arguing or you're saying is or isn't a final action or a major federal action. Is it a mine review or is it a mineral report or both? What does it do? It is our understanding that the plaintiffs here have challenged the mineral report only, which is the Forest Service's expert opinion as to whether there are valid existing rights. Neither the plaintiffs... It was a determination as to whether a change had to be made in the operating plans. It was a rendering of the Forest Service's experts' opinion as to whether the mining claims constituted a valuable mineral discovery. That's the mine review. That's the mineral report. Or the valid existing rights. Or the mine review. My apologies. The mine review was the Forest Service's examination of its existing environmental documents, its NHPA compliance previously, to determine whether the plan of operations needed to be amended. It indicated that no changes would occur to the canyon mine. That's correct. Or the plan of operations. But it also set the level of consultation for service that would engage it with the tribe. Is that correct? The Forest Service... Or no? Yes. Okay. It seems like that decision had an immediate impact on the parties. That's probably more than sufficient to me right now. Are you dividing time? Are you dividing time? Yes, I am. I apologize for not mentioning that sooner. I will be preserving six minutes for my... Having four minutes, it was when you planned to put ten minutes on the clock to make it to 20 minutes. Is that right? Yes. It was ten. I'm sorry. Can you answer my question? Yeah, sure. My answer to your question is that the practical effect doesn't matter under the Supreme Court's task for final agency action in Bennett because there has always been a national service agency. Sure. That was the focus. This court has held that the final agency action requirement can be construed pragmatically, but it never said that there could only be practical effects. And simply because the Forest Service and Energy Fuels came to an agreement that Energy Fuels would not resume operations until the Agency of Forest Service structure were to be changed. That's fair. And then this wasn't necessary. That is fair, but that does not make it so. There's no clue that the people who are making this decision thought it was so. How do we even find that it was so? Well, if you look, actually, there are contemporaneous documents cited in our brief that discuss the fact that Energy Fuels was voluntarily refraining from resuming operations. So it seems like that. I just want to back up a little bit. It seems like the sole dispute here on appeal is whether the mine review was an undertaking that was prioritized within the meaning of the NHPA. Well, I wouldn't say that that's the sole dispute. There's also a dispute. We argue that the mine review, well, the plaintiffs have not challenged the mine review, just stepping back into the mineral report, the mineral exam, about the validity of the mining claims. We are contesting one of the issues on appeal is whether the mineral report constituted an undertaking under the NHPA or an undertaking, a major federal undertaking under NEPA that would trigger NEPA analysis. I think this is the only thing that's here, right? Yes. It's the NEPA, various authorities, various agencies. What is the government's position in light of the fact that there was this decision in the continuation 20 years later, the withdrawal of the clients and the situation that the designation of these sites might be a major thing? Do you think the government, the Forest Service, the community of the HCPA, has a responsibility to deal with what it does not actually do anything? I'm glad you asked that question. This is post-administrative. Well, the Forest Service is taking its obligation seriously. I started out by saying that, and that is true. Do you have opportunities to increase? Well, for this, just so the court knows,  That's not typical for forests. And that position was created. In your documentation, of course, you just talked about the responsibility of government. Is it really part of these multi-documents that we're dealing with, in this case, resumption of the mining operation, withdrawal, and the installation of these historic sites? What are the legal responsibilities, or what is the government? The legal responsibility. Yes. And the agency system is required to know if anything is in light of those circumstances. The Forest Service here was not legally required to do anything before energy fuels could resume operations. What about, I'm sorry, my understanding with regard to the National Starboard Preservation Act is that it did treat the National Starboard designation as something that the HCPA So the agency did decide to treat the Red View traditional cultural property as a newly discovered property under the NHPA. Was it? The forest acknowledged that the regulations were not really a good fit, but that 813b3, the language which says, once a plan has been completed, consultation has been done on the plan, and then construction has started, which all were true here, then the forest should proceed under 813b3, which it did, and it continues to do. And the construction was started, but it was also stopped. That's true. But the regulations don't speak to that as being a requirement. I would also add that if you look at our service, I take it they feel that what it means is a continuing construction, and there's no longer a continuing construction. If you look at the situation as of the time that it's starting, there may have been at least a 20-year gap, it seems to me, that the forest service could have. The question is whether it had to. Well, Energy Fuels had built all of the surface structures by that point and had dug the mineshaft to 50 feet, so there was substantial construction that had been completed. But the agency did more than that. That's true, but I'd also like the court to think about what new NHPA consultation would do. What new, starting from scratch, NHPA consultation would look like for a mineral report. What kinds of alternatives, what kind of scoping could be done, and how would it look any differently? One thing that's important for this court to think about here is the fact that the tribe and the environmental groups have not identified anything that they would like the forest service to do as a concrete matter. That they're not challenging the environment. That's correct. I don't know where it is quite going to play. I mean, potentially. I mean, then we'd have a different discussion there. If they were challenged with the mine review, what would your response be? I hesitate to speculate, since I haven't had to brief that issue, but I would probably say the same thing, that it was foreclosed by this court's decision in C.P.E. v. Salazar in the Arizona 1 case. I would like the court to note, I think this is an important few pages, that F.C.R. 1115-17, that documents since 2007 what the forest service has done as far as consultation with the tribe and other tribes. And I would also like to say this information is not an administrative record. It has to do with the status of the mine, but it's important for the court to know. The forest service has completed its consultation in December 2015. It is on the forest service's website. I'm sorry, what? With the plan of tribe here, the forest service has determined that it has completed its consultation under 813-A3 and has decided to continue consulting under the record of decision with the tribe. Also, I would like the court to note that the federal government... I'm sorry, go ahead. I am conceding this hearing. You say you had no obligation to consult. You did consult. I'm sorry, it was not 100% clear when I spoke earlier. The forest service did not have an obligation to do a mine review or a mineral report. The forest service did decide that it had an obligation under 813-A3 to consult on the impacts of the Red Butte traditional cultural property. It did so and has completed that consultation in its new state. And I'm really quite confused. If it wasn't an undertaking, you weren't consulting anyway. There was no new... It would be a different consultation. What is the tribe claiming? The tribe, there's a dispute as to what the relevant undertaking here is. The tribe is arguing that the undertaking is the resumption of mining operations. The forest service's position is that the undertaking was the approval of the 1988 plan of operations. And just like how you have a supplemental environmental impact statement under NEPA, under the NHPA regulations, 813-A3, the forest service can reinitiate consultation once it has approved a plan, and that's what it did here. Well, the environmental impact statement was a final NEPA agency action. Was it conducted in the NEPA? The 1988 plan of operations and record of decision with its supporting environmental impact statement constituted the final agency action. And there's no need to have another EIS? That's correct. And again, as I had said, the forest service looked at it, the EIS, and decided that it didn't need to do anything different with the plan of operations here in the mine review. Okay, thank you. May it please the Court, my name is David DePippo, and I represent Energy Fuels. I'll just jump right back in where we were here with 813-D3. I think a little bit of clarification is important. The 813-B regulation falls under the post-review discoveries portion of the Section 106 regulations. What the advisory council did in that section is that we know that the NHPA requires ongoing consultation. We need to draw a line as to what type and how much of consultation will occur when we have a discovery of a new historic property after a project has been approved. I would agree with you that the discovery is a misnomer, but I think I certainly would disagree with the tribe when you say if there's no discovery of a new historic property, then that is the end of the matter. It's not that you go back and try and create a brand new consultation under Section 106 for a discovery that never existed in the first place. But the point I was trying to make is that the line that the advisory council drew between commencement of construction for activities that have commenced construction that fall under B3 and those that don't is an important one because it represents a balance between historic preservation and the ability of an approved project to rely on its approval, start construction, and continue. And it's an issue that's been sort of, it's been misconstrued and everything, and I think it's an important point to represent. So anyway, the fact that there is a cessation of construction within 20 years or 30 years of no significance, what if it were 15 years, what if it were 100 years? It's all of no significance. The regulations are 100% clear in their face and 100% ambiguous. Starting and stopping of a project is not a factor in determining what regulation is going to apply, whether it's going to be B1 or B3. In which respect, Your Honor? Well, what I would say is, and this sort of gets to a point that was made earlier, the idea that mining rights are somehow metaphysical. They are 100% not metaphysical once the miner meets the requirements of the mining law and establishes mining rights, which energy fuels didn't know later than 1985. It had property rights and public land. In 1986, its plan of operations was approved. It was fully, it was fully approved. But here, there was a withdrawal. And it was called, was contingent on existing rights. And it seems sensible to say that at that point, there was a necessary determination as to who had the existing rights. And so it wasn't here. So there was something in it that triggered a need for an additional determination, which was the withdrawal. I disagree, Your Honor. I think there's nothing, as Judge Campbell outlined, as I pointed to, no statute, no law, no guidance document, no case. No, but the Forest Service does. Whether the Forest Service determines exercise its discretion. Did you say that it's necessary? Well, and I think, you know, and I'll point the Court to a letter that, to two points on that. There's a letter that the Supervisor, Forest Supervisor Williams sent to Energy Fuels saying that it was necessary to conduct a mineral exam in order to approve a new plan. That's what the letter says. But the problem with that is, the Forest Service wasn't approving a new plan in this circumstance. There wasn't, as we've all discussed, there was an existing plan that had been in place for quite some time, and it was valid. Yes, Your Honor, but the fear of that is how does one determine and when does one determine whether there indeed are existing rights? There doesn't need to be a determination, Your Honor, and here's why. The mining law is different than our current laws. The mining law is a law that allows for the disposal of federal property based on the unilateral ends of a miner. And if you locate and if you discover when those two things have coincidenced, then mining rights spring. And how you know that's true, and how you know there doesn't need to be a government approval is the Supreme Court has stated repeatedly that those rights are valid until proven invalid by BLM or Interior. And in context, are you inclined to agree to abide by the Forest Service determination as to whether there were existing rights? A couple of reasons. They are both business related, Your Honor. Our client wants good relationships with their regulators, cooperates with their regulators. If you look at the letter that was sent from Harold Roberts to the Forest Advisor on September 11th of 2011, it says, We have determined we don't need any more approvals. We are willing to cooperate with you to make sure that you confirm our conclusions and go through your own analyses. The second is, and this is also in the record, that at that particular point in time, Energy Tools wasn't quite ready to start shaft sinking. It was already conducting preparatory operations on the ground. It simply accommodated the Forest Service and cooperated with the Forest Service to hold off on shaft sinking so that the Forest Service could conduct its operations. Your client would know that if the Forest Service came to a different conclusion that they would know that there were existing rights here. And initiated a claim contest or... Well, the Forest Service would have had to refer to BLM. BLM would review it and then file an action with Interior and assert that the claims were invalid. You could challenge the determination by the legal clients at that time within the Interior and the Forest Service. Correct. You could not do it in context of the determination by the Forest Service. It's not a final agency action. The position is that it's not. Is it seen by the district judge as impractical for the matter, or I guess do you think that there is a rational basis to consider this final agency action as impractical out of the Supreme Court laws? I don't. I don't even know. I think that if you look at even the Supreme Court's most recent statement in Hawks where it basically compares a preliminary jurisdictional determination under the Clean Water Act for the Army Corps with an approved jurisdictional determination, it outlines the differences between something that is preliminary, interim, something that doesn't bind, something that doesn't compel, doesn't decide legal rights, with an approved determination that does, something that compels action, and that has consequences if you don't comply with it. Thank you. First of all, as Nancy Young said, the Arizona water case, there is no NHPA issue in that case. I was very surprised to hear her say that the Forest Service District has completed consultation under Section 813B-3. That regulation requires that the forest supervisor make a determination as to measures to avoid or mitigate adverse effects, and no such decision has been made. It also requires a report to the tribes, to the ACHP, and to the Arizona SHPO as to what measures have been imposed. No such report has ever been delivered. So I began to suggest that this whole reference to 813B-3 is a sham. What was the undertaking? I asked before, but I had a different answer here than what I thought at this point. Your Honor, the structure of the statute is very good. The undertaking is the thing that could affect the historic properties. No, I'm going to ask you this. Are you saying it's the mining activity? It's the resumption of mining activity in the Kenyon Mine, in this instance. Okay. Did that require a report? Yes. How? The Forest Service told the AFR, until we show, until you establish valid existing rights at this mine site, you cannot go forward. So then you're challenging the mine review? No, we are challenging. It's the existence of the power. It doesn't matter what they do. It's the existence of the power that gives them the authority to change the plan of operations. I'm looking at the statute because it seems like it's critical to understand what the undertaking is. The undertaking is what requires everything that we're talking about. And the statute says the undertaking means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a federal agency, including those requiring a federal permit, license, or approval. Right. And so it seems like approval of the Kenyon Mine plan of operations was in the 80s and was the undertaking requiring an HPA Section 106 consultation. That's right. But at that time, revenue was not a protected property. In 2011, things had changed. The company came back. The Forest Service said you need a new agreement. We need to establish valid existing rights. Consequently, the obligation, the Forest Service's obligations under an HPA, sprang back into life. The mine review or the mineral report didn't approve any new undertaking in 2012 or modify the plan of operations. That was their ultimate solution. But they had the power to modify the plan of operations under the regulations. They could sign it. I just want to reiterate, Dwight, that the validity of the determination was the second authorization. And the Forest Service, citing its own manual, said that we have to issue the second determination before mining can resume. And they cited Yes, Your Honor. The district court's ruling is that under the mining law, our interests were not protected. He didn't have any economic interests. We didn't have any economic interests. Pardon me? The question there is different. The question for this challenging disability determination is that disability determination was not issued pursuant to the mining law or as a result of the mining law, but as a result of the withdrawal, which came about as a consequence of the flip authorization for withdrawal. And withdrawal provisions are in place to protect public values. And because the withdrawal was issued. It was not based on any values other than those within the mining law. Correct. And the fact that the test. Yes, Your Honor. Because the test that's used for withdrawal as to whether or not there's valid existing rights is the same test that's used under the mining law to determine whether there's a discovery of a valuable mineral deposit. But the action here is the valid existing rights determination to accept the mine from the withdrawal. So it was taken pursuant to the Federal Land Policy and Management Act, not was it actually taken by the forest service under the mining law. And so in that sense, our interests.  Even if the mining law provided the relevant statutory basis for the Forest Service Act, we are still protected by the requirements that a mining company to develop claims has to show a discovery of a valuable mineral deposit. And that limitation benefits our clients interest in conserving the land around the Grand Canyon, because it's not as though everyone can establish a claim and begin mining. But instead they have to establish a claim and then demonstrate that there's a discovery of a valuable mineral deposit. And this requirement or limitation. Is it the case that there's been no challenge to the mine review? I'm sorry? Is it the case that there has been no challenge to the mine review? Oh, absolutely not. We definitely challenge. Oh, I'm sorry. I get it. No, the validity determination is the only action that we challenge. And that's the action that was taken pursuant to the withdrawal. And that's, again, why I think that Flint provides the standard for evaluating zone of interest. Thank all of you for your argument. Thank you, Your Honor. I'm only curious some more about the withdrawal and the next hour. But in the exchange, I would have something to do with the supply. I'm a person. So. Our services.
judges: Berzon, Murguia, Block